

# IN THE UNITED STATES DISTRICT COURT FOR
# THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ZURICH AMERICAN INSURANCE COMPANY and AMERICAN ZURICH INSURANCE COMPANY, | )<br>)<br>)<br>) |
| Petitioners, | ) Civil Action No. 14 CV 3454 |
| v. | ) Hon. Charles R. Norgle |
| STAFFING CONCEPTS INTERNATIONAL, INC., et al., | )<br>)<br>) |
| Respondents. | ) |

## OPINION AND ORDER

Before the Court is Petitioners Zurich American Insurance Company and American Zurich Insurance Company's (collectively, "Petitioners") motion to confirm the final arbitration award ("Final Award") that was entered on May 7, 2015 against Respondents Staffing Concepts International, Inc. ("SCI"), Leasing Resources of America, Inc. ("LRA"), and Professional Management Services Group, Inc. ("PMSG") f/k/a PEO Management Group, Inc. a/k/a PEO Management Services Group, Inc. (collectively, "Respondents"). For the following reasons, the motion is granted.

## I. BACKGROUND

Petitioners provided workers compensation insurance to Respondents in connection with eight consecutive policy years from March 1, 2004 to March 1, 2012. In 2013, a dispute arose regarding the "non-policy agreements" between the parties from 2004 to 2012. Petitioners sought recovery of past amounts invoiced to PMSG under the non-policy agreements, as well as, additional collateral to protect Petitioners from future losses. To resolve the dispute, Petitioners sent an arbitration demand to Respondents in May of 2013. A three-arbitrator panel (the "Panel") was selected pursuant to the arbitration agreement and arbitration proceedings began.

On May 21, 2013, Respondents, jointly represented by the same attorney in the arbitration proceeding, filed an answering statement acknowledging that they were signatories to the arbitration agreement and presented a joint defense to the Panel. Respondents objected to the arbitrability of Petitioners' demand, arguing that the state statutes of Florida precluded the arbitration of their insurance contract dispute. The Panel denied the objection. Respondents proceeded to actively participate in the arbitration by conducting discovery and filing the appropriate pleadings. Respondents did not challenge the arbitration in federal court.

The first filing before this Court did not occur for almost a year; on May 12, 2014, Petitioners filed a petition to confirm an arbitration order, which directed Respondents to post $12,496,308.00 as security prior to the final arbitration hearing. On May 30, 2014, Peter J. Muchunas ("Mr. Muchunas") from the law firm McIntyre, Thanasides, Bringgold, Elliot, Grimaldi & Guito, P.A. entered an appearance on behalf of all Respondents and objected to the petition. Then, prior to this Court's ruling, Thomas M. Cushing ("Mr. Cushing") and Christopher A. Kreid from the law firm Christopher A. Kreid & Associates, LLC filed a motion to substitute counsel for LRA. The motion stated that "LRA is represented in this action by attorney Peter J. Muchunas...LRA has recently discharged Peter J. Muchunas...[and] LRA has engaged attorneys Thomas M. Cushing and Christopher A. Kreid...to represent it... ." Mot. for Substitution of Att'ys at 1. The Court ordered the parties to file an agreed written status report before it ruled on the pending petition. After reviewing the status report, the Court found that a final decision from the Panel was imminent because the final arbitration hearing had already occurred; so, it denied the petition as moot on February 27, 2015.

Meanwhile, LRA made the same substitution of counsel in the arbitration proceeding and the Panel heard LRA's new objection to arbitrability at a pre-hearing conference on January 7, 2015. LRA argued that it was not a signatory to the non-policy agreements, thus not bound to

arbitrate the matter. The Panel denied the objection. It found that estoppel barred LRA from avoiding the arbitration because LRA did not comply with American Arbitration Association Commercial Rule 7(c) and LRA's objection, coming only days before the final hearing, had been waived.

After four days of evidentiary hearings and receiving post-hearing briefs, the Panel issued its Final Award on May 7, 2015. The Panel once again entertained LRA's defense that it never executed a non-policy agreement, thus it could not be held liable. The Panel found three independent bases why LRA was bound under the 2011 non-policy agreement: (1) Debra Hubbard ("Ms. Hubbard"), president of PMSG, had implied authority to sign the agreement on behalf of LRA; (2) LRA ratified Ms. Hubbard's signature when it became a party to the Collateral Trust Agreement, which incorporated the 2011 non-policy agreement; and (3) LRA ratified the agreement by receiving insurance benefits from Petitioner and by participating in the arbitration. Finding in favor of Petitioners, the Panel found: (1) SCI liable for $16,881,619.00[1] in principal, $6,874,840.00 in collateral, and $28,578.64 in interest; (2) PMSG liable for $16,280,940.00 in principal, $1,355,480.00 in collateral, and $26,284.38 in interest; and (3) LRA liable for $10,244,014.00 in principal, $6,660,829.00 in collateral, and $14,970.90 in interest. In sum, the Panel found Respondents jointly and severally liable with the total award not to exceed $16,662,867.00 in principal, $7,989,435.00 in collateral, and $29,601.24 in interest. Petitioner now moves to confirm the Panel's Final Award in all respects.

## II. DISCUSSION

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq*, "reflects an 'emphatic federal policy in favor of arbitral dispute resolution.'" KPMG LLP v. Cocchi, 132 S. Ct. 23, 25 (2011) (citations omitted). If a petition is timely submitted in a proper venue with jurisdiction, then,

---

[1] It is clear from the Final Award that the total award of principal is $16,662,867.00. The Panel's finding that SCI owes $16,881,669.00 in principal appears to be "an evident material miscalculation of figures or an evident material mistake." See 9 U.S.C. § 11(a). Accordingly, the Court modifies SCI's liability for principal to $16,662,867.00.

3

notwithstanding Sections 10 and 11, "a judgment of the court shall be entered upon the award made pursuant to the arbitration." 9 U.S.C. § 9. Respondents SCI and PMSG do not object. Respondent LRA, however, argues that it never agreed to arbitrate, therefore, "the arbitrators exceeded their powers" and the award should be vacated. See id. § 10(a)(4). Petitioners argue that LRA waived this argument; and that regardless of the waiver, the Panel correctly decided that LRA had a duty to arbitrate; thus, all that is left is for the Court is to confirm the Final Award.

**A. Standard of Decision**

"Judicial review of arbitration awards is tightly limited; perhaps it ought not be called 'review' at all." Baravati v. Josephthal, Lyon & Ross, Inc., 28 F.3d 704, 706 (7th Cir. 1994). "If the district judge is satisfied that the arbitrators resolved the entire dispute and can figure out what that resolution is, he must confirm the award." IDS Life Ins. Co. v. Royal Alliance Assocs., Inc., 266 F.3d 645, 650-51 (7th Cir. 2001).

**B. LRA Waived Its Argument That It Was Not A Signatory To The Agreement To Arbitrate**

LRA's argument is correct to a point; "[a]rbitration is contractual by nature—a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." Zurich Am. Ins. Co. v. Watts Ind. Ins., Inc., 417 F.3d 682, 687 (7th Cir. 2005) (internal quotations and citations omitted). However, with "[t]hat said, there are five doctrines through which a non-signatory can be bound by arbitration agreements entered into by others: (1) assumption; (2) agency; (3) estoppel; (4) veil piercing; and (5) incorporation by reference." Id. (citations omitted). "Thus, even though the ordinary rule is that the question whether an agreement to arbitrate exists is one for the court, the right to a judicial determination of arbitrability is, like many rights, one that can be waived." Envtl. Barrier Co., LLC v. Slurry Sys., Inc., 540 F.3d 598, 606 (7th Cir. 2008) (citations omitted).

The arbitration proceeding and arguments in this case are similar to Environmental Barrier Co., LLC, 540 F.3d 598. A litigant in Environmental Barrier, a company called SSI, participated in arbitration for seven months and did not challenge the arbitrability of the dispute until the opposing party, a company called EBC, filed an action to confirm the award in federal court. In opposition to the confirmation of the award, SSI argued that EBC was not a signatory to the agreement, thus, there was no agreement to arbitrate and the arbitrator did not have the authority to decide the dispute. However, "[o]nly after the arbitrator issued an award unfavorable to SSI and the case wound up in court did SSI raise an objection to the arbitrator's authority to decide the dispute." Id. at 606. Affirming the district court's confirmation of the arbitration award, the Environmental Barrier court held that SSI waived its objection to arbitrability "[b]y freely submitting to the arbitration of its claims without preserving a challenge to the arbitrator's authority." Id. at 607. The Seventh Circuit emphasized that SSI's late challenge was "not a tactic we can accept, for sound policy reasons. It is terribly wasteful of the arbitrator's time, the parties' time, and the court's time." Id.

As the procedural history elucidates here, LRA has waived its argument that it was not a signatory to the arbitration agreement. The arbitration proceeding began in May 2013 and has continued for twenty-six months. The pleadings filed in the arbitration and the pleadings filed before this Court all explicitly show that LRA has been represented by legal counsel throughout the dispute resolution process. As a matter of law, "litigants are bound by the acts and omissions of their chosen agents, including lawyers, and that legal bungling therefore does not justify reopening a judgment." Choice Hotels Int'l, Inc. v. Grover, --- F.3d ---, 2015 WL 4081169 at *2 (7th Cir. July 7, 2015) (citing Link v. Wabash R.R., 370 U.S. 626 (1926)). In this case, LRA was first represented by Mark M. Barber ("Mr. Barber") from the law firm Broad and Cassel, next by Mr. Muchunas, and now by Mr. Cushing. The Motion to Substitute Counsel, signed by Mr.

Cushing and Mr. Muchunas, acknowledges that LRA was previously represented by Mr. Muchunas during the arbitration and the pleadings filed in the arbitration proceeding verify that assertion. LRA is bound by the actions or inactions of its attorneys of record and cannot blame its attorney as a ground to vacate the Panel's award. See Choice Hotels Int'l, Inc., --- F.3d ---, 2015 WL 4081169 at *1 ("Litigants who choose a poor lawyer may bear the costs themselves, or shift them to the lawyer, but cannot shift them to an adversary who bore no fault for the problem.")

The May 21, 2013 Objection to Arbitrability filed by Mr. Barber admitted that LRA was a signatory to the arbitration agreement. The only objection to arbitrability made on LRA's behalf was on the ground that the state laws of Florida preempted the Federal Arbitration Act. LRA then actively participated in the arbitration proceeding for over a year before filing anything in this Court.

On June 05, 2014, Mr. Muchunas filed a responsive pleading to Petitioners' request to confirm the Panel's order requiring Respondents to post pre-hearing security in the amount of $12,496,308.00. In that pleading, Mr. Muchunas appeared as counsel for all Respondents and raised a general objection under 9 U.S.C. § 10(a)(4), stating that "[t]he arbitration agreement is unenforceable and is currently being challenged before the Panel." Resp'ts' Answer to Pet. to Confirm Arbitration Award and Req. for Vacatur at 2. The second responsive pleading filed by Mr. Muchunas on behalf of all Respondents (once again including LRA) elaborated on his argument why the award should be vacated. The argument was that the Panel's pre-hearing security award constituted a fine or punitive damage award, which exceeded the authority of the Panel under the parties' arbitration agreement. Notably, this argument not only implies that an enforceable arbitration agreement exists, but it is void of any argument that LRA was not a party to the arbitration agreement.

The first time that LRA raised the current basis for objecting to arbitration was at a pre-hearing conference with the Panel on January 7, 2015, twenty months after arbitration proceedings began. Furthermore, the current objection came only after the Panel ordered LRA and the other Respondents to post a bond over $12 million, and that "order [was] intended to be a partial final award." Pet. to Confirm Arbitration Award, Ex. B at 7. None of the earlier objections contended that LRA was not a signatory to the non-policy agreement; in fact, the first objection admitted that LRA was a signatory. By January 2015, the argument had been waived. LRA had already freely submitted to and participated in the arbitration. See Envtl. Barrier Co., LLC, 540 F.3d at 607; see also Slaney v. The Int'l Amateur Athletic Fed'n, 244 F.3d 580, 591 (7th Cir. 2001).

> Futhermore, Petitioners assert, and the record supports, that at this stage of the dispute:
>
> the parties [have] exchanged more than 350,000 pages of documents and conducted six depositions. The arbitrators had multiple pre-trial conferences with the parties resulting in eleven pre-hearing orders. The final arbitration hearing lasted four days and involved three arbitrators, three sets of counsel, live testimony from six witnesses, and more than one hundred exhibits. The parties submitted both pre-hearing and post-hearing briefs to the arbitrators.

Zurich's Reply in Supp. of Mot. to Confirm Arbitration Award at 1-2. And that goes without mention of the Panel's nineteen-page Final Award and the fourteen months of litigation in this Court. It would be against sound policy for this Court to sustain LRA's objection and vacate the award when so much time and so many resources have been invested into resolving this dispute. Nonetheless, the Panel already resolved the issue in its Final Award and its finding that LRA had a duty to arbitrate is satisfactory. It appears that LRA only raised this objection when the tide of the arbitration began to shift and collapse upon it—when it was ordered to post over $12 million as security before the final arbitration hearing. The Court will not re-entertain LRA's objection. See Slaney, 244 F.3d at 591 ("Our judicial system is not meant to provide a second bite at the

apple for those who have sought adjudication of their disputes in other forums and are not content with the resolution they have received.").

For the reasons above, Sphere Drake Insurance v. All American Insurance Co., 256 F.3d 587 (7th Cir. 2001), Zurich American Insurance Co., 417 F.3d 682, and the other cases that LRA cites are unhelpful for its proposition that judicial review of its obligation to arbitrate the matter is required. In those cases, the party objecting to arbitration raised and preserved the objection to the judiciary before actually engaging in the arbitration proceedings. The Court finds that LRA has waived its right to a judicial determination of arbitrability.

Notwithstanding that finding, the Court does not take lightly LRA's contention that "LRA did not know it was in the arbitration case, did not hire an attorney on its behalf, and did not authorize or ratify the representation that LRA was a signatory to the Program Agreement that contains the arbitration clause." LRA's Resp. to Mot. to Confirm Arbitration Award at 5. In support of this contention, LRA submits an affidavit signed on or around June 11, 2015, from John W. Hardin ("Mr. Hardin"), its President, CEO, and owner. If true, it is a serious problem that LRA did not know that it hired Mr. Barber or Mr. Muchunas to represent it in the arbitration. Remember that, "litigants are bound by the acts and omissions of their chosen agents." Choice Hotels Int'l, Inc., --- F.3d ---, 2015 WL 4081169 at *2 (emphasis added).

Mr. Hardin's sworn statement says that it was "[u]nknown to LRA or its officers, that [the] agreement which PM[S]G signed with ZURICH also named LRA as a party to the agreement." Second Aff. of John W. Hardin at ¶ 4. This is worth mentioning because LRA submitted only four insurance claims in the 2011 policy year, totaling merely $12,484.00; yet, it is now saddled with a judgment against it totaling about $16.9 million. This disparity sounds unconscionable, beyond the bounds of what LRA bargained for, and at the very least, unequitable. On the other hand, the four claims LRA submitted are further evidence that LRA

8

knew about the agreement and ratified it; because LRA participated in the insurance policy and received benefits from it. Regardless, the issue of equity was for the Panel to decide. Whether PMSG and Ms. Hubbard can be held liable to indemnify LRA for exceeding the scope of their agency relationship when they signed on LRA's behalf is a different matter that is not before this Court. LRA even mentions in its response brief that it is pursuing that potential remedy in federal court in Florida.

Regarding LRA's assertion that it was not represented by any legal counsel and did not know about the arbitration proceeding, Mr. Hardin states:

> These steps [in arbitration] were taken without notice to [him] or to LRA that ZURICH was seeking to hold LRA jointly liable for PM[S]G's breaches. Any assertions or admissions by an attorney that LRA was a signatory to the agreement containing the arbitration clause, or that LRA otherwise consented to arbitration of this matter, were made without [his] knowledge or authorization or the authorization of LRA.

Second Aff. of John W. Hardin at ¶ 6. If this is true, LRA could arguably have a malpractice claim against Mr. Barber, Mr. Muchunas, and their respective law firms. Nonetheless, this is still not a basis for vacating the Panel's Final Award because "intentional misconduct of lawyers is likewise imputed to their clients," see Choice Hotels International, Inc., --- F.3d ---, 2015 WL 4081169 at *2 (citing Societe Internationale v. Rogers, 357 U.S. 197 (1958), and National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639 (1976)), and it is undeniable that Mr. Barber and Mr. Muchunas intentionally entered appearances and filed pleadings on behalf of LRA. That does not mean that LRA is left without a potential remedy. "When lawyers fail, the remedy is malpractice litigation against the wrongdoer, not more litigation against an innocent adversary in the original litigation." Id. Petitioners are nothing more than innocent adversaries here.

However, LRA's assertion that Mr. Barber and Mr. Muchunas would immerse themselves in the litigation without notifying or formally representing LRA is implausible. There

9

was voluminous and costly discovery in this case; no one contends that counsel volunteered their services and paid for the costs of the documents. It is more likely that these attorneys sent invoices to LRA and may have even received payment from LRA for their services.

That being said, the veracity of Mr. Hardin's statements deserve scrutiny. He goes on to state that "[he] was advised that LRA was a Respondent in this matter in August of 2014." Second Aff. of John W. Hardin at ¶ 8. This statement uses passive voice and clearly omits how or who told him about LRA's involvement in the arbitration. Who advised him? He says he "did not speak with attorneys of record for LRA and PM[S]G until November or December of 2014." Id. It is also suspicious why he waited five months from the time that he learned LRA was involved in the arbitration to substitute counsel. He includes no explanation for the delay. Why would anybody wait five months to contact a new attorney to fix a situation in which they were erroneously ordered to forfeit over $12 million? Furthermore, how does a person who is so involved in a company (Hardin describes himself as President, CEO, and owner of LRA) not know for eighteen months that his company is facing a potential multi-million dollar judgment? Mr. Hardin admits that LRA had a contractual business relationship with PMSG. In its Final Award, the Panel found that Mr. Hardin "worked at his brother's company, SCI, for 20 years." Zurich's Reply in Supp. of Mot. to Confirm Arbitration Award, Ex. 1 at 13. Did the Respondents not confer? Did Mr. Hardin and his brother not talk? These facts imply that Mr. Hardin engaged in conscious avoidance of knowing about LRA's involvement in the arbitration.

Also unusual, is that the first affidavit signed and submitted by Mr. Hardin on or around January 21, 2015, mentions absolutely nothing about being unaware that LRA was represented by an attorney in the arbitration. This is despite Mr. Hardin's statement in his second affidavit that he knew LRA was a party to the arbitration since August 2014, five months before

submitting the first affidavit. As represented in his affidavit, Mr. Hardin's nonfeasance as an officer of LRA is remarkable.

The Court has not conducted an evidentiary hearing in this matter, and does not reach the conclusion that Mr. Hardin lacks credibility. However, Mr. Hardin is admonished of the severe consequences of making false or misleading statements or omissions under the guise of a sworn affidavit to this Court and any other tribunal. And, Mr. Cushing is admonished of the consequences of submitting such a statement to the Court.

### III. CONCLUSION

The Court finds LRA waived its argument that it was not a signatory to and not bound by the agreement to arbitrate. There is no need for the Court to reach Petitioners' additional arguments. The Court confirms the Panel's Final Award. Judgment in favor of Petitioners is to enter accordingly: (1) SCI is liable for $16,662,867.00 in principal, $6,874,840.00 in collateral, and $28,578.64 in interest; (2) PMSG is liable for $16,280,940.00 in principal, $1,355,480.00 in collateral, and $26,284.38 in interest; and (3) LRA is liable for $10,244,014.00 in principal, $6,660,829.00 in collateral, and $14,970.90 in interest. Respondents are jointly and severally liable with the total award not to exceed $16,662,867.00 in principal, $7,989,435.00 in collateral, and $29,601.24 in interest.

IT IS SO ORDERED.

ENTER:

_____
CHARLES RONALD NORGLE, Judge
United States District Court

DATE: July 23, 2015